**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PHILADELPHIA INDEMNITY INSURANCE COMPANY,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Case No. 09 C 7063** |
| **CHICAGO TITLE INSURANCE COMPANY and WESTERN CAPITAL PARTNERS, LLC,** | ) ) ) | |
| **Defendants.** | ) ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY,  District Judge:

Philadelphia Insurance Company and Chicago Title Insurance Company both provided liability insurance to Western Capital Partners, LLC.  Western Capital was sued and asked Chicago Title to defend the lawsuit.  Chicago Title agreed to defend only certain claims asserted in the suit, declining to defend the others pursuant to a term in the insurance policy that said Chicago Title was obligated to defend only those causes of action covered by the policy.  Western Capital then requested that Philadelphia defend the remaining claims in the lawsuit.  Philadelphia objected, claiming its policy was excess to Chicago Title's policy, and contending that Chicago Title was obligated under Illinois law to defend the entire lawsuit.

Philadelphia has filed suit seeking a declaratory judgment that Chicago Title's policy is the primary policy for the suit against Western Capital and that Chicago Title is obligated to defend the entire suit.  Chicago Title and Western Capital have asserted

various crossclaims against each other.  Philadelphia has moved for summary judgment on its claim, and Chicago Title has moved for summary judgment on several of its and Western Capital's crossclaims.  For the reasons stated below, the Court grants Philadelphia's motion and grants Chicago Title's motion in part.

**Facts**

In the summer of 2006, Western Capital agreed to lend $2,775,000 to several individuals and businesses, including a corporation called Jackson Park Pinnacle Plaza, LLC.  As security for the loan, Jackson Park provided Western Capital with a promissory note and three mortgages on property in Chicago:  a first mortgage on property on South Ridgeland Avenue, a second mortgage on property located on West Erie Street, and a second mortgage on property on South Kenwood Avenue.  Western Capital engaged Chicago Title to insure the validity of the titles associated with the properties and assist with the loan closing.

Western Capital and Chicago Title discussed the terms of the insurance policy and the loan closing in several communications, including a document referred to in the pleadings as an "instruction letter."  In this letter, sent on July 10, 2006, Western Capital's attorney affirmed that Chicago Title had in its possession both the loan documents and the loan funds, as well as various statements of conditions for disbursement of the funds.  The Court will discuss these conditions in more detail below.  On July 13, 2006, a representative of Chicago Title "acknowledge[d] receipt of all the Items and Funds referred to in the foregoing letter, and hereby unconditionally and irrevocably agree[d] to the terms contained therein."  Chicago Title Ex. 2 at 7.

On July 13, 2006, Chicago Title issued a loan policy covering Western Capital's

interest in the three properties.  The policy insures against matters including "loss or damage . . . sustained or incurred by the insured" for reasons including "[t]itle to the estate . . . being vested other than as stated therein," "defect in or lien or encumbrance on the title," "[u]nmarketability of the title," "invalidity or unenforceability of the lien of the insured mortgage upon the title," and the "priority of any lien or encumbrance over the lien of the insured mortgage."  Chicago Title Ex. 1 at 2.  Exclusions from coverage under the policy include "[d]efects, liens, encumbrances, adverse claims or other matters . . . created, suffered, assumed or agreed to by the insured claimant" or "resulting in no loss or damage to the insured claimant."  *Id.* at 3.

For present purposes, a key provision of the policy is the paragraph concerning Chicago Title's obligation to provide a defense to Western Capital.  The policy states:

> Upon written request by the insured, . . . [Chicago Title], at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy.  [Chicago Title] shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. [Chicago Title] will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

*Id.* at 4.

On August 29, 2007, Western Capital filed a lawsuit initiating foreclosure proceedings on the Ridgeland and Erie mortgages.  On November 16, 2007, Western Capital filed an amended complaint in that action in which it dropped the claim to foreclose on the Erie mortgage.  On November 29, 2007, Western Capital filed a separate suit to foreclose on the Erie mortgage.  On May 15, 2008, Western Capital

filed a second amended complaint in the Ridgeland foreclosure action that, in addition to seeking foreclosure, asserted various breach of contract and fraud claims against individuals and entities associated with the property.

On February 6, 2008, several entities, including Jackson Park Pinnacle, filed a lawsuit in the chancery division of the Circuit Court of Cook County against defendants including Western Capital, captioned *Ridgeland East End LLC v. Perkins*, Case No. 08 CH 6055. The parties to the current case all agree that the *Ridgeland East End* litigation has been substantively and procedurally convoluted. It essentially involves entities claiming to have an interest in the three mortgaged properties who assert that Western Capital and its associates engaged in a scheme to defraud them and deprive them of their interest. In the first version of the chancery complaint, the *Ridgeland East End* plaintiffs asserted twelve claims, seven of which they asserted against Western Capital: one claim for negligence; one claim for violation of the Illinois Interest Act, 815 ILCS 205/6; four claims for violation of various provisions of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/2; and one claim to quiet title. In four of these claims, the plaintiffs specifically requested as relief the invalidation or subordination of Western Capital's rights in the insured mortgages.[1]

On February 29, 2008, Western Capital tendered the defense of the *Ridgeland East End* lawsuit to Chicago Title. On April 15, 2008, a Cook County Circuit Court judge entered an order consolidating Western Capital's foreclosure action and the

---

[1]This statement is based on an admission by Chicago Title that four of the claims asserted in the *Ridgeland East End* litigation triggered its defense obligations. This and similar statements in this opinion should not be construed as a ruling by the Court that the other asserted claims would not have been covered by Chicago Title's policy.

*Ridgeland East End* lawsuit. On April 16, 2008, the *Ridgeland East End* plaintiffs filed an amended complaint that included fourteen counts, nine of which they asserted against Western Capital (the claims listed in the previous paragraph plus two claims for breach of contract). A subsequent amended complaint filed on May 7, 2008 included the same claims.

On May 15, 2008, Western Capital filed a second amended complaint in its foreclosure suit regarding the Ridgeland property. It asserted additional claims against several of the *Ridgeland East End* plaintiffs. On June 19, 2008, some of these plaintiffs (defendants in the foreclosure action) filed an answer, which included affirmative defenses related to allegedly forged mortgage documents. Western Capital notified Chicago Title of this answer on July 16, 2008.

On August 15, 2008, Chicago Title sent Western Capital a letter stating its belief that "[t]here appears to be no set of facts which could be proved" under which the claims for violation of the Interest Act and breach of contract, as well as three of the ICFA claims, "would be covered under the Policy." Chicago Title Ex. 22 at 6. The letter went on to state that Chicago Title "agrees to pay the reasonable and necessary costs of independent counsel arising out of the defense of" the remaining counts. *Id.* at 8.

On August 12, 2009, the state court judge dismissed with prejudice eight of the counts asserted against Western Capital and dismissed the ninth count (the quiet title claim) without prejudice and with leave to re-plead within twenty-one days. There is no suggestion in the record that any of the claims have been re-pled. On December 27, 2009, several of the defendants in the foreclosure action were granted leave to file nineteen counterclaims, twelve of which they asserted against Western Capital. These

5

claims included a claim to quiet title and an ICFA claim seeking a declaration that another mortgage was a first lien on the Ridgeland property.

On November 9, 2010, a Circuit Court judge dismissed with prejudice as against Western Capital all of the counterclaims that had been asserted against it. The counterclaimants revised the claims somewhat and moved to re-file them on August 29, 2011. On September 23, 2011, a judge granted the counterclaimants leave to re-file the counterclaims "solely for the purpose fo preserving issues for appeal." Chicago Title Ex. 46 at 2.

## Discussion

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999); Fed. R. Civ. P. 56(c). A court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The nonmoving party must offer something more than a 'scintilla' of evidence to overcome summary judgment . . . and must do more than 'simply show that there is some metaphysical doubt as to the material facts.'" *Roger Whitmore's Auto. Servs., Inc. v. Lake County*, 424 F.3d 659, 667 (7th Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The parties in this case, like those in the underlying litigation, have asserted a variety of claims against each other. Philadelphia has requested a declaratory

judgment on two matters: that its policy is excess to Chicago Title's policy, and that it is not obligated to pay unreasonable attorney's fees voluntarily incurred by Western Capital. The Court previously denied Philadelphia's motion for judgment on the pleadings on the first of these points. *Phila. Indem. Ins. Co. v. Chi. Title Ins. Co.*, No. 09 C 7063, 2010 WL 2757542 (N.D. Ill. July 13, 2010). Philadelphia now seeks summary judgment on that claim.

Chicago Title's crossclaim against Western Capital includes six counts, seeking declaratory judgment as follows: (1) it has no further obligation to defend Western Capital; (2) it has no obligation to reimburse Western Capital for fees incurred by Hatch Jacobs LLC or Hinshaw & Culbertson LLP; (3) it has no obligation to reimburse Western Capital for any fees or losses incurred in connection with claims regarding the Erie and Kenwood Mortgages; (4) it is only obligated to reimburse Western Capital for forty-four percent of the costs of defending the *Ridgeland East End* litigation; (5) it is not obligated to reimburse Western Capital for any costs associated with Western Capital's attempts to foreclose upon the Ridgeland mortgage; and (6) Western Capital breached its obligations under the insurance policy by failing to cooperate with Chicago Title in the *Ridgeland East End* litigation.

Western Capital's crossclaim against Chicago Title includes five claims: (1) Western Capital is entitled to a declaration of its rights and Chicago Title's obligations under the insurance policy and instruction letter; (2) Chicago Title is in breach of contract for failing to perform its obligations under the instruction letter; (3) Chicago Title is in breach of contract for failing to perform its obligations under the insurance policy; (4) Chicago Title has engaged in deceptive practices in violation of ICFA; and (5)

7

Chicago Title has engaged in unfair practices in violation of ICFA.

Chicago Title has moved for summary judgment on counts one through four of its crossclaim and all counts of Western Capital's crossclaim. Chicago Title has also moved to strike one of the exhibits that Western Capital has submitted in support of its motion: the affidavit of J. Mark Fisher, Western Capital's lead trial counsel in the underlying litigation. Chicago Title argues that Fisher's affidavit contains legal analysis that constitutes expert testimony and that the Court may not consider this testimony because he was not disclosed as an expert witness. Western Capital responds that it included Fisher in its Rule 26(a)(1) disclosures and that all of his testimony is that of a fact witness.

Chicago Title is correct that certain statements in the affidavit go beyond the province of a fact witness. The Court accordingly will not consider statements such as those characterizing the "clusters of claims" in the *Ridgeland East End* litigation, Fisher Aff. ¶ 4, or specifically responding to Chicago Title's contentions, because these statements constitute argument rather than fact. *See, e.g.*, *id.* ¶¶ 9 ("I disagree with [Chicago Title's] statement that its allocation methodology is reasonable or fits with the facts of the Underlying Litigation.") & 16 ("We respectfully disagree that [Chicago Title's billing] guidelines enumerate appropriate standards of reasonable fees."). These statements constitute the entirety or a majority of paragraphs four through seven and nine through sixteen of the affidavit.

Other statements in the affidavit, however, including some statements in the indicated paragraphs, are properly grounded in Fisher's personal knowledge of the underlying litigation. To the extent that they describe the work he has done, they may

8

be considered as evidence of the course the litigation has taken. *See, e.g.*, *id.* ¶¶ 8 ("[The] principal focus in the Underlying Litigation was [the plaintiff's] contention that the [Western Capital] Mortgage was unenforceable because the signatures of these individuals were 'forgeries.') & 12 (describing how Western Capital's attorneys spent more time working on mortgage issues than on the other causes of action). The Court therefore grants Chicago Title's motion to strike in part and will consider only those portions of Fisher's affidavit that state facts about his work on the *Ridgeland East End* litigation.

## A.    Duty to defend

### 1.    Duty to provide a complete defense

The major issue in this case concerns the scope of Chicago Title's duty to defend Western Capital against the claims and counterclaims asserted against it in the *Ridgeland East End* litigation. The threshold question in this analysis is one the Court examined in its earlier decision denying Philadelphia's motion for judgment on the pleadings: whether, having admitted a duty to defend Western Capital against one or more counts in the underlying complaints, Chicago Title had a duty under Illinois law to defend against the complaints in their entirety.

In its previous ruling, the Court recognized the well-settled Illinois rule that if an insurer "has a duty to defend as to at least one count of the lawsuit, it has a duty to defend in all counts of that lawsuit." *Pekin Ins. Co. v. Wilson*, 237 Ill. 2d 446, 453 n.2, 930 N.E.2d 1011, 1015 n.2 (2010) (citing *Maryland Cas. Co. v. Peppers*, 64 Ill. 2d 187, 355 N.E.2d 24 (1976)). State and federal courts applying Illinois law have consistently

held that, under the rule established in *Maryland Casualty*, "an insurer certainly has a duty to defend its insured against any complaint that leaves open the possibility of coverage." *Health Care Indus. Liab. Ins. Program v. Momence Meadows Nursing Ctr., Inc.*, 566 F.3d 689, 696 n.9 (7th Cir. 2009). "Even if some of the conduct alleged is not covered that will not obviate the duty to defend if conduct covered by the policy is also alleged." *Conn. Indem. Co. v. DER Travel Serv., Inc.*, 328 F.3d 347, 349 (7th Cir. 2003). "If any one claim potentially falls within the scope of coverage, the insurer must provide a defense." *Hurst-Rosche Eng'rs, Inc. v. Commercial Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir. 1995). Therefore, "an insurer may not justifiably refuse to defend a lawsuit against its insured unless it is clear from the face of the underlying complaint that the allegations set forth in the complaint fail to state facts that bring the case within, or potentially within, the coverage of the policy." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 223 Ill. 2d 352, 363, 860 N.E.2d 307, 315 (2006)

Chicago Title contends that the insurance policy's limitation of coverage to certain "stated causes of action" renders the default Illinois rule inapplicable. In the Court's previous ruling, it declined Philadelphia's request to enter judgment on the pleadings in its favor on this point. The Court stated that Philadelphia had cited no case "in which a court has held that an insurance company must defend all causes of action when, as in this case, the insurance contract expressly limits the duty to defend to those causes of action that are covered by the policy." *Phila. Indem.*, 2010 WL 2757542, at *3. The Court therefore concluded that Philadelphia had not controverted Chicago Title's contention that its contractual language "at least arguably overcomes

10

the general rule that the duty to defend extends to all actions if at least one is covered by the policy." *Id.* at *4.

The parties have re-argued this issue at length in their motions for summary judgment. Although Chicago Title does not contend that the Court's previous determination constitutes binding "law of the case," the Court recognizes that this "doctrine advises against a court reopening previously decided issues." *Moriarty v. Svec*, 429 F.3d 710, 722 (7th Cir. 2005). The Court's denial of Philadelphia's motion for judgment on the pleadings, however, was not a final determination on this question, as indicated by the use of the word "arguably." In any event, "'law of the case' do[es] not prohibit the trial judge from revisiting an earlier ruling while there is still time to prevent error." *Runyon v. Applied Extrusion Techs., Inc.*, 619 F.3d 735, 739 (7th Cir. 2010). Upon further research and careful consideration of the parties' arguments, the Court concludes that its previous indication that Chicago Title may contract around the complete defense rule was an incorrect statement of Illinois law.

No Illinois case that either party has cited or that the Court has found provides a direct answer to the question at issue. In fulfilling its "duty . . . to apply state substantive law, as [it believes] the highest court of [Illinois] would apply it," the Court nonetheless has "a range of tools at [its] disposal." *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 634-35 (7th Cir. 2007). These tools include "other relevant state precedents, analogous decisions, [and] considered dicta." *Id.* at 635 (internal quotation marks and citations omitted). "In the absence of any authority from the relevant state courts, we also shall examine the reasoning of courts in other jurisdictions addressing the same issue and

applying their own law for whatever guidance about the probable direction of state law they may provide." *Id.*

A district judge in Ohio recently considered the same question in a case in which Chicago Title was also the defendant and the exact same policy language was at issue. *Little Italy Dev., LLC v. Chi. Title Ins. Co.*, No. 1:11 CV 212, 2011 WL 2532663 (N.D. Ohio June 24, 2011). The judge noted that Ohio's Supreme Court has ruled on the duty-to-defend question in the same way as the Illinois Supreme Court, holding that "[o]nce an insurer must defend one claim within a complaint, it must defend the insured on all the other claims within the complaint." *City of Sharonville v. American Employers Ins. Co.*, 109 Ohio St. 3d 186, 846 N.E.2d 833, 837 (2006).

Chicago Title argued in *Little Italy* that "pursuant to the express terms of the policy, it agreed to provide less coverage than the coverage required by *City of Sharonville*." *Little Italy*, 2011 WL 2532663, at *3. "In other words, Chicago Title claim[ed] that the Ohio Supreme Court's pronouncement may be modified by agreement between the parties." *Id.* The judge rejected this argument, noting that the court in *City of Sharonville* did "not even reference the policy language in its opinion." *Id.* The judge concluded that "[b]ecause the court does not interpret and apply the scope of the policy in arriving at its decision, . . . *City of Sharonville* necessarily created a duty to defend *implied in law*." *Id.* (emphasis added). The judge cited a court in Texas that came to a similar conclusion, basing its decision on similar language from state-court cases as well as a public-policy rationale. *See Lawyers Title Ins. Corp. v. Graham Mortgage Corp.*, No. 4:09-cv-262, 2010 WL 2635074, at *5 (E.D. Tex. Apr. 16,

2010) ("[O]rdinarily, there is no reasonable means of prorating costs of defense between covered and noncovered items[, and] separate representation for covered and noncovered items is not feasible.") (internal quotation marks and citation omitted).

Chicago Title argues here that Ohio's rule differs from that of Illinois, citing *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 433, 930 N.E.2d 999, 1003 (2010) ("[T]he rules applicable to contract interpretation govern the interpretation of an insurance policy.").  According to Chicago Title, "because Illinois courts base decisions concerning the construction of insurance policies on contract interpretation principles," the duty to provide a complete defense in Illinois stands in "stark contrast" to the same duty in Ohio.  Chicago Title's Resp. at 6.  This argument, however, disregards the fact that the court in *City of Sharonville* also noted that Ohio insurance policies are interpreted according to contract-law principles.  *City of Sharonville*, 109 Ohio St. 3d at 187, 846 N.E.2d at 836.  The case concerned whether claims against city police officers concerned acts within the scope of the officers' employment – if they did not, the insurance policy at issue would not cover them.  The court's analysis made clear that it used contract-interpretation principles to determine whether a particular claim is covered by an insurance policy.  As the judge in *Little Italy* noted, however, the court did not rely on the terms of the policy when applying the duty to provide a complete defense once it was clear that one claim was covered.  *See Am. Chem. Soc. v. Leadscope, Inc.*, No. 04-AP-305, 2005 WL 1220746, at *5 (Ohio Ct. App. May 24, 2005) ("Ohio . . . courts have followed both the pleadings test and the one claim-all claims principle in duty to defend cases.").  In short, the duty was imposed by law, not

implied in the contract.

Illinois cases apply a similar analysis when considering an insurer's duty to defend. In *Maryland Casualty*, the Illinois Supreme Court observed that in the underlying complaint, the insured was "charged with both conduct for which the policy affords coverage and conduct for which it does not," including intentional conduct. *Maryland Cas.*, 64 Ill. 2d at 193, 355 N.E.2d at 28. The court then affirmed a trial-court ruling that the insurer was obligated to defend the insured "in the . . . case," stating, "If the complaint alleges facts within the coverage of the policy or potentially within the coverage of the policy the duty to defend has been established." *Id.* "This duty to defend extends to cases where the complaint alleges several causes of action or theories of recovery against an insured, one of which is within the coverage of a policy while the others may not be." *Id.* at 194, 355 N.E.2d at 28. For both of these propositions, the court made no reference to the policy language, instead citing a large number of Illinois cases and secondary sources. This strongly indicates that, like courts in Ohio, Illinois courts impose the complete defense rule as a matter of law, turning to the policy language only to determine whether any facts in a complaint bring a case within the scope of coverage.

Other Illinois cases applying the *Maryland Casualty* rule use the same two-step process: determining first whether any claim is within a policy's coverage and, if it is, holding that the insurer has the duty to defend the entire lawsuit. *See, e.g.*, *Valley Forge*, 223 Ill. 2d at 362-63, 860 N.E.2d at 314-15 (describing principles for interpreting an insurance policy and noting that the duty to defend applies "even if only one of

several theories of recovery alleged in the complaint falls within the potential coverage of the policy" as it is construed); *U.S. Fid. & Guar. Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 73-74, 578 N.E.2d 926, 930 (1991). No case that Chicago Title has cited or that the Court has found suggests that the duty to provide a complete defense arises based on the terms of an insurance policy rather than as a matter of law. The Court therefore concludes that Chicago Title may not contract around this duty.

Although no Illinois court has considered this precise question, several related decisions provide support for the Court's analysis. Chicago Title relies on an Eighth Circuit case for the proposition that "courts have taken a strong stand against holding insurers liable for the defense costs of claims their polices do not cover, even when those claims are joined with other claims." *Enron Corp. v. Lawyers Title Ins. Corp.*, 940 F.2d 307, 311 (8th Cir. 1991). That proposition, however, is contradicted by numerous Illinois cases, including those cited above, holding insurers liable for the defense of all claims in a complaint even if only one claim is potentially covered. *See Solo Cup Co. v. Fed. Ins. Co.*, 619 F.2d 1178, 1185 (7th Cir. 1980) ("To hold otherwise would be to place upon the insured the burden of demonstrating in advance of the underlying litigation which of the competing theories of recovery against it was applicable for purposes of insurance, thereby frustrating one of the basic purposes of such a clause in the insurance contract protection of the insured from the expenses of litigation.").

Illinois courts have also suggested that state law disfavors the allocation of defense costs on a claim-by-claim basis. In one case, an insurer argued that "the [*Maryland Casualty*] court did not intend to hold that the insurer is obligated to provide a

defense against causes of action or theories of recovery not insured under the policy."
*JG Indus., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 218 Ill. App. 3d 1061, 1067-68,
578 N.E.2d 1259, 1263 (1991). Though the policy at issue did not contain language
like that in Chicago Title's policy, the Illinois Appellate Court construed the policy's
language as "fairly strong evidence that the parties did not intend [a particular claim] to
be covered." *Id.* at 1066, 578 N.E.2d at 1262. Despite this, the court rejected the
argument that the trial court should have "allow[ed] apportionment of the costs so that
[the insurer] will bear only the costs related to the covered claim." *Id.* at 1067, 578
N.E.2d at 1262. It concluded that "adoption of an interpretation which would limit an
insurer's defense costs to covered portions of the complaint must be left to the supreme
court." *Id*. at 1068-69, 578 N.E.2d at 1263; *see also Bedoya v. Ill. Founders Ins. Co.*,
293 Ill. App. 3d 668, 674-75, 688 N.E.2d 757, 761 (1997) ("Notwithstanding the fact that
other jurisdictions have found that the duty to defend may be allocated between the
insurer and the insured based upon the claims involved . . . [*Maryland Casualty*] is the
settled law in Illinois.").

Chicago Title's arguments suggest that the law recognizes a difference between
claims like those at issue in *JG Industries*, which were simply not covered by the
insurance policy, and claims that are affirmatively excluded by a policy term. Illinois
courts have also found, however, that the duty to provide a complete defense applies to
claims that are not just left out of an insurance policy but specifically excluded by it. In
a lawsuit against a restaurant by a former employee, the Illinois Appellate Court
examined an insurance policy that expressly excluded claims for employment-related

practices. Although most of the underlying complaint dealt with matters related to employment, the court determined that a defamation claim concerned several statements, some of which were related to employment and some of which were not. *Am. Alliance Ins. Co. v. 1212 Rest. Group, LLC*, 342 Ill. App. 3d 500, 510, 794 N.E.2d 892, 900 (2003). The court concluded that because some of the statements at issue "do not fall under the purview of the exclusion, . . . [i]t is well settled [that] the insurer has a duty to defend the insured as to the entire complaint." *Id*. at 500, 794 N.E.2d at 901.

Other decisions have echoed this analysis. *See, e.g.*, *West Bend Mut Ins. Co. v. Rosemont Exposition Servs., Inc.*, 378 Ill. App. 3d 478, 492, 880 N.E.2d 640, 652 (2007) (finding no duty to defend when a complaint only concerns employment and "makes no additional allegations of defamation that could ultimately bring the case beyond the scope of the [employment-related practices] exclusion."). The Illinois Supreme Court has also noted that the duty to provide a complete defense applies even when one of the claims in an underlying complaint concerns an event that occurred outside the insurance policy's coverage period. *Pekin*, 237 Ill. 2d at 453 n.2, 930 N.E.2d at 1015 n.2.

In the Court's view, the language at issue in Chicago Title's policy, which makes a blanket statement that uncovered claims will not be defended, does not meaningfully distinguish the present case from these cases. Just as in these cases, Chicago Title had a duty to defend Western Capital on all counts of a complaint that contained covered claims even though certain counts were excluded by the language of Chicago Title's insurance policy.

17

Upon further reflection, the Court has also reconsidered its observation that two cases cited in its previous decision indicate "that parties may contract for insurance terms that deviate from the default rule established in *Maryland Casualty*." *Phila. Indem.*, 2010 WL 2757542, at *3. One of these cases concerned whether the terms of certain insurance policies required the insurers "to defend new actions and to continue defend actions pending . . . after the limits of liability under those policies have been exhausted by the payments of judgments or settlements." *Zurich Ins. Co. v. Raymark Indus., Inc.*, 118 Ill. 2d 23, 31, 514 N.E.2d 150, 154. In answering this question, the Illinois Supreme Court cited *Maryland Casualty* for the rule that an "insurer must defend an action even though it *may not* ultimately be obligated to indemnify the insured." *Id.* at 52, 514 N.E.2d at 163 (emphasis in original). The court concluded, however, that when "the insurer has no potential obligation to indemnify[,] it has no duty to defend." *Id.* This, however, does not indicate that parties can contract around the duty to provide a complete defense when a particular claim gives rise to a potential obligation to indemnify.

The second case the Court cited concerned an insurer that indicated its willingness to defend the insured in a letter that also reserved its rights "to recoup any defense costs paid in the event that it is determined that the Company does not owe the Insured a defense in this matter." *Gen. Agents Ins. Co. of Am. v. Midwest Sporting Goods Co.*, 215 Ill. 2d 146, 148, 828 N.E.2d 1092, 1094 (2005). After a court held that the insurer had no duty to defend, the insurer moved to recover its defense costs. The Illinois Supreme Court determined that the right to recoup appeared only in the

reservation of rights letter, not in the insurance policy.  The court "refuse[d] to permit an insurer to recover defense costs pursuant to a reservation of rights absent an express provision to that effect in the insurance contract between the parties."  *Id.* at 166, 828 N.E.2d at 1104.  This case, however, focused on whether an insurer can, through a reservation-of-rights letter, assert a right that does not appear in a policy, not on whether a policy itself can undo a default rule imposed by law.

For these reasons, the Court concludes that Chicago Title had a duty to provide Western Capital with a complete defense in any lawsuits including a cause of action covered by Chicago Title's insurance policy.

**2.    Duty to defend in the underlying litigation**

How and when the duty to provide a complete defense applies to the actual course of the *Ridgeland East End* litigation is the issue at the heart of Philadelphia's claim, counts one and three of Western Capital's crossclaim, and counts one, two, four, and five of Chicago Title's crossclaim.  The parties dispute the periods of time during which Chicago Title was obligated to provide a defense and the specific defense costs for which it was responsible during those periods.

The Court's task is therefore to determine when, since the commencement of the *Ridgeland East End* suit, a reasonable fact finder could conclude that there were claims asserted against Western Capital that were within the scope of the coverage provided by Chicago Title's insurance policy.  Chicago Title argues that there have been periods since Western Capital first tendered the defense of the *Ridgeland East End* case during which no pending claims triggered its duty to defend.  Specifically, Chicago Title points

19

out that the initial chancery complaint was dismissed on August 12, 2009, and the counterclaims in the foreclosure portion of the lawsuit were not filed until December 27, 2009.  The counterclaims were dismissed on November 9, 2010 and re-filed on September 24, 2011.

Western Capital does not appear to dispute that when there were no covered claims pending against it, Chicago Title had no duty to provide it with a defense. Instead, it disagrees with Chicago Title's conception of a pending claim.  Western Capital argues that Chicago Title's duty to defend has never ceased since the filing of the *Ridgeland East End* lawsuit.  Specifically, Western Capital contends that even when the causes of action within the policy's coverage had been dismissed, the substance of covered claims was asserted via affirmative defenses to the foreclosure action. Western Capital also argues that the *Ridgeland East End* plaintiffs "clearly did not consider their adverse claims against the [Western Capital] Mortgage to be resolved" because they "were still engaged in aggressive efforts and discovery" to support them. Western Capital Resp. at 9-10.

Western Capital cites no law to support the contention that an insurer's duty to defend against "claims" or "causes of action" may be triggered by the assertion of affirmative defenses in litigation that the insured has initiated.  The Court acknowledges that the affirmative defenses asserted by certain of the *Ridgeland East End* plaintiffs could be considered, if proven, to have an effect on Western Capital's title.  Illinois cases considering an insurer's duty to defend, however, consistently refer to the "theories of recovery alleged in the *complaint*."  *Valley Forge*, 223 Ill. 2d at 363, 860 N.E.2d at 315 (emphasis added); *see also, e.g.*, *Outboard Marine Corp. v. Liberty Mut.*

20

*Ins. Co.*, 154 Ill. 2d 90, 108, 607 N.E.2d 1204, 1212 (1992) ("the face of the underlying complaint"); *Pekin Ins. Co. v. Dial*, 355 Ill. App. 3d 516, 823 N.E.2d 986, 990 (2005) (the "factual allegations of the complaint"); *Momence Meadows Nursing Ctr.*, 566 F.3d at 696 ("any complaint that leaves open the possibility of coverage").  In "unusual or compelling circumstances," courts may look to pleadings other than the complaint to determine whether an insurer has a duty to defend against a particular claim.  *Pekin*, 237 Ill. 2d at 465, 930 N.E.2d at 1022.[2]  The cases consistently indicate, however, that the scope of a duty to defend concerns claims made against an insured, rather than a third party's response to a claim brought by the insured.  No case that the Court has found suggests that Illinois law requires insurers to defend an insured against affirmative defenses.

Western Capital similarly cites no law in support of its contention that a defense obligation can be triggered by the fact that certain claims "are still . . . threatened to be asserted" against an insured.  Western Capital Resp. at 4.  The Seventh Circuit has held that the duty to defend "applies only to facts that are explicitly alleged; it is the actual complaint, not some hypothetical version, that must be considered."  *Amerisure Mut. Ins. Co. v. Microplastics, Inc.*, 622 F.3d 806, 812 (7th Cir. 2010).  "When an insurer

---

[2]In *Pekin*, the Illinois Supreme Court held that a court could consider the fact that an insured had raised the affirmative defense of self-defense in the underlying litigation because the insurance policy at issue contained a self-defense exception.  "Because self-defense can only be raised as an affirmative defense," unless a defendant-insured's pleading is considered, "there is no way for the self-defense exclusion to be triggered, and the coverage is illusory."  *Scottsdale Ins. Co. v. Walsh Const. Co.*, No. 10-1565, 2011 WL 4538456, at *6 (N.D. Ill. Sept. 29, 2011).  This rationale does not support the proposition that an affirmative defense asserted in a lawsuit brought by an insured can trigger an insurer's obligation to defend a claim.

determines whether it has a duty to defend, implied claims that are not specifically alleged can be ignored." *Id.* After the state court dismissed the claims and counterclaims at issue here, the operative "actual complaints" no longer contained claims "specifically alleged" against Western Capital. Even if Western Capital's attorneys still had to do work related to the *Ridgeland East End* litigation, an insurer's "defense obligations . . . continue until such time as the claim against the insured is confined to a recovery that the policy does not cover." *Solo Cup*, 619 F.2d at 1185. No Illinois case the Court has found indicates that a duty to defend continues beyond that point or otherwise applies during a period in which there is no covered claim actively asserted against the insured. The Court therefore "decline[s] to adopt a 'substantive innovation' in [Illinois] law . . . absent some authority to suggest that the approval of the Supreme Court of [Illinois] is forthcoming." *Pisciotta*, 499 F.3d at 640 (citations omitted). Neither affirmative defenses implicating title nor the threat of additional or reasserted claims triggered Chicago Title's duty to defend Western Capital.

 For its part, Chicago Title appears to argue that the fact that the state court allowed the *Ridgeland East End* plaintiffs to re-plead certain counterclaims "solely for the purpose of preserving the issue for appeal" means that those claims cannot trigger its duty to defend. Chicago Title's Mem. at 6. It provides no argument or legal support, however, for the proposition that this removes the counterclaims from the coverage of the policy. The Court therefore concludes that Chicago Title's defense obligation applied while those claims were asserted.

The Court concludes that Chicago Title was not obligated to reimburse Western Capital for the defense costs it incurred other than in connection with the defense of

claims (meaning counts of a lawsuit) or counterclaims. The parties appear to agree that there were no such claims actively pending against Western Capital between August 12, 2009 and December 27, 2009 or between November 9, 2010 and September 23, 2011. Thus Chicago Title was not responsible for defense costs that Western Capital incurred during these periods. For the remainder of the period commencing when Western Capital tendered its defense throughout the pendency of the *Ridgeland East End* suit, however, Chicago Title was obligated to defend Western Capital in that litigation. And as the Court held in the previous section, when Chicago Title was under this obligation, it was required to provide Western Capital a complete defense in the lawsuit.

For these reasons, the Court denies Chicago Title's motion for summary judgment with regard to counts one and four of its crossclaim and counts one and three of Western Capital's crossclaim. Chicago Title also seeks summary judgment on counts two and five of its crossclaim. The Court grants Chicago Title summary judgment on count five – a request for a declaratory judgment that Chicago Title is not obligated to reimburse Western Capital for costs associated with its foreclosure – to the extent that the claim concerns Western Capital's affirmative litigation regarding the foreclosure. To the extent that count five concerns Western Capital's defense against the counterclaims in the foreclosure action, however, the Court denies Chicago Title's motion for summary judgment. Finally, because Chicago Title's briefs contain no argument regarding count two, the Court denies its motion with regard to that claim.

Chicago Title's argument that Philadelphia's policy is not "excess" to its own policy is based solely on its contention that it was obligated to defend only the covered

causes of action and that Chicago Title insurance was not "available to" Western Capital for the remainder of the claims. Given the Court's ruling on this matter, this contention is unavailing. The Court therefore grants Philadelphia's motion for summary judgment on count one of its complaint, concluding that Philadelphia's policy is excess to the Chicago Title policy during the periods when Chicago Title was obligated to provide Western Capital a defense.

## B.    Erie and Kenwood mortgages

Chicago Title has moved for summary judgment on count three of its crossclaim, in which it seeks a declaratory judgment that it has no obligation to reimburse Western Capital for any fees or losses related to the Erie or Kenwood mortgages. Neither Western Capital nor Philadelphia addresses Chicago Title's arguments on this point. The Court concludes that they have forfeited any potential arguments on this matter and grants summary judgment in Chicago Title's favor on count three of its crossclaim.

## C.    Instruction letter

In count two of its crossclaim, Western Capital asserts a claim for breach of contract based on Chicago Title's alleged failure to comply with its obligations under the instruction letter. Chicago Title seeks summary judgment on this claim, arguing that the instruction letter does not constitute an enforceable agreement and that even if it does, Western Capital has failed to allege a breach of its terms.

The instruction letter notes Chicago Title's obligation to "confirm the accuracy of the legal descriptions contained in" the mortgages, "cause all of the [loan documents] to be duly executed, initialed, and notarized," and "issue" a particular set of loan policies

regarding the insured mortgages. Chicago Title Ex. 2 at 2-3. The letter then states, "If .

. . you are not prepared to unconditionally and irrevocably insure the enforceability and

priority of [the mortgages] and otherwise comply with the terms of these instructions,

then you are **NOT** to accept or disburse the [documents] or the Funds." *Id.* at 4

(emphasis in original). As noted above, the agent who signed the instruction letter on

Chicago Title's behalf indicated that the company "acknowledge[d] receipt of all the

Items and Funds referred to in the foregoing letter, and hereby unconditionally and

irrevocably agree[d] to the terms contained therein." *Id.* at 7.

Chicago Title nonetheless maintains that the instruction letter does not create an

enforceable agreement. It argues that the instruction letter merged into the

subsequently executed insurance policy. "A complete, valid, written contract merges

and supersedes all prior and contemporaneous negotiations and agreements dealing

with the same subject matter." *Courtois v. Millard*, 174 Ill. App. 3d 716, 720, 529

N.E.2d 77, 79 (1988). Western Capital responds that the two documents did not deal

with the same subject matter. The Court agrees. The insurance policy concerns

Chicago Title's obligations as a title insurer; the instruction letter recites its

responsibilities as a closing agent. The instruction letter is an enforceable agreement.

Western Capital, however, has not identified any breach of this agreement. Its

crossclaim contains only the conclusory allegation that "Chicago Title failed to perform

its obligations under the Instruction Letter." Western Capital Second Am. Crossclaim ¶

19. The only argument in Western Capital's brief on this point is contained in the

following paragraph:

Furthermore, the language of the [instruction letter] makes it clear that Chicago Title is agreeing to not only issue the Policy, but also agreeing to ensure the loan documents were duly executed, initialed, and notarized. The Cook Entities in the Underlying Litigation have consistently represented that the relevant loan documents were forged. Western Capital has been forced to defend against these counts at substantial costs. It is undisputed that Chicago Title has not reimbursed Western Capital's costs in defending these counts. Thus, at a minimum, Chicago Title breached its obligation in the [instruction letter].

Western Capital's Resp. at 16.

Western Capital's argument appears to be that Chicago Title is in breach of its obligation to ensure the validity of the loan documents because the plaintiffs in the underlying lawsuit have asserted that those documents were invalid. The instruction letter, however, is not an insurance policy that obligates Chicago Title to defend Western Capital; that obligation is contained in the insurance policy. Rather, the instruction letter requires Western Capital to prove an actual breach of its terms by Chicago Title. Western Capital, however, offers no evidence from which a reasonable fact finder could conclude that the allegations in the underlying lawsuit have been proven.

For these reasons, the Court concludes that Chicago Title is entitled to summary judgment on count three of Western Capital's crossclaim.

**D.    ICFA**

In a previous version of its crossclaim, Western Capital asserted that Chicago Title committed a "deceptive and unfair practice" in violation of ICFA. Western Capital First Am. Crossclaim ¶ 92. Chicago Title moved for judgment on the pleadings, arguing that Western Capital failed to state a claim for violation of ICFA and had alleged only a breach of contract. The Court concluded that Western Capital's allegations "that it was

misled into purchasing the title insurance policy and that [Chicago Title], in bad faith, evaded its contractual obligations" were "sufficient to state a claim under ICFA."  Order of July 12, 2011 at 2 (citing *Gen'l Ins. Co. of Am. v. Clark Mall Corp.*, No. 08 C 2787, 2010 WL 1286076, at *4 (N.D. Ill. Mar. 30, 2010) ("To state a claim under [ICFA],  a plaintiff must allege: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) that the deception occurred in a course of conduct involving trade and commerce; and (4) actual damage to the plaintiff; (5) proximately caused by the deception.").

Western Capital then filed an amended crossclaim in which it asserts two claims under ICFA:  one for deceptive practices and one for unfair practices.

### 1.    Deceptive practices

Western Capital's argument that Chicago Title committed deceptive practices in violation of ICFA is premised on the contention that Chicago Title engaged in false advertising by "representing it would promptly pay any claims, when, in fact, [it] engages in numerous delays and excuses causing consumers to incur substantial expenses covering costs while awaiting claim determinations."  Western Capital's Resp. at 19. Western Capital argues that Chicago Title's website, which Western Capital personnel reviewed before deciding to engage Chicago Title as its insurer, "concealed several of its business practices," including its purported practices "not [to] respond to claims letters for many months" and to "impose arbitrary allocation techniques to apportion its fees."  *Id.* at 18-19.  Chicago Title responds that the claims relate only to its "allegedly improper claims handling process" and are therefore "nothing more than contract claims in disguise."  Chicago Title's Mem. at 21.

27

Western Capital first maintains that the Court's earlier decision on Chicago Title's motion for judgment on the pleading constitutes the law of the case, foreclosing Chicago Title's contract-claims argument. This argument is unavailing, for two reasons. First, since the Court's ruling, Western Capital has bifurcated its ICFA claim: unlike the claim the Court previously analyzed, which alleged "deceptive and unfair" conduct, the current version of count four alleges only deceptive conduct. Second, as Chicago Title points out, the Court's previous ruling applied the standards of a motion to dismiss and thus considered only whether Western Capital had alleged actionable conduct. On a motion for summary judgment, the Court must determine whether Western Capital has provided evidence from which a reasonable fact finder could find Chicago Title liable.

The Court concludes that even if a reasonable fact finder were to believe all of Western Capital's statements regarding the representations in Chicago Title's advertisements, that fact finder could not find that Chicago Title violated ICFA. None of the arguments in Western Capital's brief, and none of the statements in the affidavits on which it relies, supports a contention that deceptive conduct occurred through anything other than Chicago Title's failure to honor its contractual obligations. "When allegations of consumer fraud arise in a contractual setting, the plaintiff must prove that the defendant engaged in deceptive acts or practices distinct from any underlying breach of contract." *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011). "'[A] deceptive act or practice involves more than the mere fact that a defendant promised something and then failed to do it.'" *Id.* (quoting *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 169, 835 N.E.2d 801, 844 (2005)).

Western Capital has provided no evidence to support its contention that Chicago

Title never intended to honor its obligations in the first place. Even if Western Capital had done so, this would not save its claim. The Illinois Appellate Court has rejected a plaintiff's contention that a defendant was liable under ICFA for entering a contract with no intention of performing, noting that "if litigants could invoke [ICFA] merely by alleging an intentional or fraudulent breach of a contract, common-law breach of contract actions would be supplemented in every case with an additional and redundant remedy." *Lake County Grading Co. of Libertyville, Inc. v. Advance Mech. Contractors, Inc.*, 275 Ill. App. 3d 452, 459, 654 N.E.2d 1109, 1116 (1995); *see also Central Diversey MRI Ctr., Inc. v. Med. Mgmt. Scis., Inc.*, 952 F. Supp. 575, 578 (N.D. Ill. 1996) (holding that allegation of "scheme to attract business with no intention of performing the promised services" is a "naked attempt to avoid the rule prohibiting suits under [ICFA] in ordinary breach-of-contract situations.").

For these reasons, the Court grants summary judgment in Chicago Title's favor on count four of Western Capital's crossclaim.

### 2. Unfair practices

Western Capital argues that Chicago Title's handling of the claims determination process constituted an unfair practice in violation of ICFA. This argument is based on the following allegations. Although Western Capital submitted its initial claim on February 29, 2008, Chicago Title did not provide Western Capital with a determination until August 15, 2008. Chicago Title could have made this determination solely based on the allegations in the *Ridgeland East End* complaint, and there was no need for it to request numerous documents. Chicago Title then agreed to defend only some of the

counts in the complaint but did not initially propose an allocation method. On October 30, 2008, after Western Capital had submitted bills from its counsel, Chicago Title offered to pay twenty-five percent of the fees. On November 10, 2008, Chicago Title agreed to pay forty-four percent of Western Capital's fees, but it did not reimburse Western Capital until several days later. Chicago Title invited Western Capital to suggest an alternate allocation method but never truly considered Western Capital's proposal, resulting in the waste of Western Capital attorneys' time. Chicago Title also rejected many of Western Capital's requests for reimbursement of attorneys' fees after determining that the expenses were not within Chicago Title guidelines. Chicago Title suggested that it would reconsider these determinations, but it did not do so, even after Western Capital's attorneys spent significant time preparing submissions supporting reconsideration. Finally, Chicago Title engaged in similar behavior with respect to the counterclaims in the underlying action.

Western Capital relies on *Ciszewski v. Denny's Corp.*, No. 09 C 5355, 2010 WL 2220584, at *2 (N.D. Ill. June 2, 2010), for the proposition that a "practice is unfair under the ICFA if it offends public policy; is immoral, unethical, oppressive or unscrupulous; or causes substantial injury." A practice "offends public policy if it is contrary to what has been established by statutes, the common law, or otherwise – whether . . . it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness." *Id.* (internal quotation marks and citation omitted). A practice is oppressive if it "leaves the consumer with little alternative except to submit to it and results in the lack of meaningful choice." *Id.* at *3 (internal quotation marks

and citations omitted).

In support of its contention that Chicago Title's alleged conduct is actionable under this standard, Western Capital cites only *Clark Mall*, which concerned allegations that an insurer had engaged in a lengthy and oppressive investigation process after a fire involving the insured's property. According to the complaint, the investigation took more than a year, involved hours of testimony and thousands of pages of documents, and resulted only in the insurer contending, without explanation, that the claim was barred. *Clark Mall Corp.*, 2010 WL 1286076, at *1-2. In denying the insurer's motion to dismiss, the court stated:

> Breach of contract is not actionable under the Consumer Fraud Act. A breach of contract occurs when the other side candidly says, "I'm not performing." When, however, the non performance is concealed under a facade of compliance with one's contractual obligations and a series of dilatory, deceptive and punitive maneuvers designed to mask that non performance, a very different calculus is presented. That is what the counterclaim in essence alleges occurred here. It depicts not merely an inefficient failure to follow through on obligations GICA had under the policy, but an insurance company that was doing all in its power to wear down the insureds and to put off indefinitely a frank decision regarding coverage and the reasons for the denial. The allegations can be read as charging an attempt by GICA to set up the insured for a claim on non-cooperation, thereby enabling GICA to claim that it was the insured who breached the contract. The insureds were promised their claims would be assessed in a reasonable and honest manner. But when they finally had a claim, what they got, according to the counter claim, was the proverbial "run around."

*Id.* at *5.

Western Capital argues that Chicago Title engaged in "improper conduct which was deceptive, unfair and an attempt . . . to do everything in its power to wear down [Western Capital] and unreasonably deny coverage through the guise of allocation." Western Capital's Resp. at 24. According to Western Capital, rather than assessing

the claims in the promised "reasonable and honest manner," Chicago Title engaged in "a campaign . . . to wait out its insured and force them to succumb to the oppressive allocation method . . . without regard to facts that disputed the arbitrary nature of [Chicago Title's] allocation method."  *Id.* at 24-25.

Chicago Title's alleged conduct is distinguishable from the conduct at issue in *Clark Mall*.  Although Chicago Title has not contested that it took over five months to arrive at a determination, it did make one eventually, allowing some degree of coverage and providing a detailed explanation for the claims it would not cover.  The insurer in *Clark Mall*, by contrast, was alleged to have waited for over a year before denying coverage entirely without explanation.  And as Chicago Title points out, its insurance policy entitled it to request documents and other materials in connection with an investigation as part of its claims process.

Western Capital's remaining allegations are essentially that Chicago Title did not cover what it said it was going to cover and that it improperly rejected reimbursement requests.  Like the claims of deceptive conduct, these matters are more properly considered as part of a claim for breach of contract.  Western Capital contends that Chicago Title failed to deliver on its promise to reconsider some of these determinations.  The fact that Western Capital attorneys may have had to waste time on requests for reconsideration does not constitute evidence from which a reasonable fact finder could conclude that Chicago Title's conduct was so patently unfair or oppressive as to be actionable under ICFA.  Finally, although the Court has ruled that Chicago Title's proposed method for allocating defense costs is impermissible under Illinois law, there is no evidence from which a reasonable fact finder could conclude that

Chicago Title's did anything other than attempt to proceed in accordance with its policy or that it knew that policy to be impermissible. Thus, no reasonable fact finder could conclude that this aspect of Chicago Title's process was actionable under ICFA.

For these reasons, the Court grants Chicago Title's motion for summary judgment in its favor on count five of Western Capital's crossclaim.

## Conclusion

For the reasons stated above, the Court grants Philadelphia's motion for summary judgment on count one of its complaint [docket no. 195]. The Court grants Chicago Title's motion for summary judgment on count three of its crossclaim, the portion of count five of its crossclaim that concerns affirmative litigation, and counts two, four, and five of Western Capital's crossclaim [docket no. 198]. The motion is otherwise denied. The Court grants in part Chicago Title's motion to strike the affidavit of J. Mark Fisher [docket no. 226]. The case is set for a status hearing on May 15, 2012 at 8:30 a.m., by telephone. Plaintiff's counsel is to get defendants' counsel on the telephone and then call chambers. Counsel should be prepared to discuss what issues remain to be tried.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: May 11, 2010